DONOGHUE v. SHAW.

NEGLIGENCE — DENTISTS — MALPRACTICE — PHYSICIANS AND SURGEONS.

Evidence that plaintiff had a number of teeth pulled by defendant, who, after the operation, assured her that apparent inability to close her jaw would pass off in a short time; that plaintiff, eight days later, being unable to close her mouth, again consulted defendant, who advised her the jaw was not dislocated, that it was shortly afterwards found by another physician to be dislocated and was treated and cured; that such dislocation can be detected by an ordinarily skillful physician, was sufficient to require the submission to the jury of the question of defendant's negligence in failing to discover the dislocation on her second visit, the testimony of plaintiff being disputed by that of defendant.

Error to Wayne; Murfin, J. Submitted April 12, 1912. (Docket No. 19.) Decided May 31, 1912.

Case by Mary Donoghue against James H. Shaw for malpractice. Judgment for plaintiff. Defendant brings error. Affirmed.

*O'Neil & Command (Geo. F. & Peter J. Monaghan,* of counsel), for appellant.

*William P. Lane,* for appellee.

STONE, J. This is an action on the case wherein the plaintiff alleged that she employed the defendant, who is a dentist, to extract all of her teeth; that in the performance of this work on January 18, 1909, the defendant negligently dislocated the lower jaw of the plaintiff, and allowed the plaintiff to suffer from such dislocation until, to wit, April 6, 1909. The plea was the general issue.

Upon the trial, the plaintiff gave evidence tending to show the employment of the defendant as alleged; that she was put under an anæsthetic—chloroform—and her teeth extracted, 22 or 24 in number; that when she came out from under the influence of chloroform she could not close her mouth; that she managed to make defendant understand her condition, and he replied that it was a natural thing, as a rule, after pulling so many teeth, for the muscles of the jaw to contract; but that in a few hours, after the effects of the chloroform wore off, the jaw would close. She testified that she continued to suffer intensely; that, not being able to close her mouth, she went to the defendant eight days after he extracted the teeth, and he examined the jaw thoroughly and said it was not out; that he advised her to rub her face with liniment several times a day, and maybe that would relax the muscles; that defendant advised her to try and loosen the muscles by chewing gum; that she asked the defendant when she should come again; that he replied that he could not do anything about taking an impression until the mouth closed; and that there was no necessity of her coming to him again until it closed. The plaintiff testified that the

condition continued; that she continued to suffer greatly and could not eat hard food; that on April 2d, following, she called upon the defendant again; that he called in Dr. C. G. Burgess, who at once said the jaw was dislocated, that it was a "forward dislocation;" that upon being told of the dislocation she went to Harper Hospital on April 5th, and Dr. Ballin reduced the dislocation by manipulation.

Dr. Ballin, a practicing physician and surgeon, was sworn on behalf of plaintiff. He testified as to the manner in which he reduced the dislocation; that he immediately detected that the jaw was dislocated, upon seeing her; that she had her mouth open, and lips apart. Upon cross-examination he testified: That dislocation of the jaw was not frequent, but that it did sometimes occur in extracting teeth; that he would not say, from his experience with reference to the dislocation of the lower jaw, that it would be an indication of improper treatment on the part of a dentist, that is, not necessarily; if upwards of 22 teeth were extracted at this one sitting, it might be difficult to detect readily the fact that the jaw was dislocated; that the jaw might be dislocated after the extraction of that many teeth, and still it might not be perceptible to a lay person; it might be that immediately after such an operation, as the extracting of teeth, a doctor could not detect a dislocation of the jaw; that the fact that she was under chloroform at the time the teeth were extracted, and that the muscles of the jaw were, consequently, relaxed, would make the tendency greater for the jaw to become dislocated; that he diagnosed dislocation just as soon as he saw the plaintiff, without putting his hand on her to find the dislocation.

The plaintiff was corroborated by other witnesses, but no other medical testimony was offered in her behalf.

There was a sharp conflict in the testimony of the plaintiff and defendant, especially as to the claim that defendant examined the plaintiff eight days after the teeth were extracted. The defendant and his wife positively

denied that any such examination took place, or, in fact, that any examination at all took place until April 2d, when she first called for an examination; that the plaintiff called to return a shawl two days after the teeth were extracted, but that no examination was made; that she then reported that she was feeling better; and that he had told her to come in from time to time so he could look at her mouth. And the defendant offered testimony tending to show that plaintiff's jaw was not dislocated at the time the teeth were extracted.

The defendant offered as a witness Dr. Don N. Graham, a practicing dentist, who testified, among other things, that it was not an unusual happening to have dislocation of the jaw while extracting teeth, especially where from 20 to 30 teeth were extracted at one sitting.

"I will say it is comparatively unusual. If I may explain myself, I would say that while practically every person has extraction of teeth, comparatively few have dislocation of the jaw through extraction of the teeth; but it is not uncommon at all to have a dislocated jaw from extraction of teeth. I would not put it so strongly as to say it is a frequent occurrence. It occurs. It is not any surprise when it does occur, because it does occur. A dislocation of the jaw while a dentist is extracting teeth is not necessarily any indication of the application of excessive force. A dislocation may be the result of a number or factors. It might be the result of a shallow socket, glenoid cavity, promoting an easy displacement of the condyle, or the upper part of the lower jaw."

He further testified that the extraction of all the teeth would cause pain throughout all the head in a vast majority of cases; that the mere statement by the patient that she had pain in her jaw would be no evidence to the dentist that her jaw was dislocated. The witness further testified that, assuming the facts to be as claimed by the defendant relating to the operation, there was no indication of carelessness or unskillfulness on the part of defendant.

Dr. James E. Burgess, a practicing physician, testified to the good standing of defendant; that he had known the

jaw to be dislocated by yawning; that he did not have any trouble diagnosing such a case; that the ordinarily skillful man can immediately detect a complete dislocation.

Dr. Claude G. Burgess, a practicing physician, testified, in behalf of defendant: That he was called by defendant to see the plaintiff on April 2d. That when he came in the defendant said he thought he had a patient with a dislocated jaw. He examined the plaintiff and agreed that the jaw was dislocated. That he did not have any trouble diagnosing it. And that the reputation of defendant was that of a careful and skillful dentist.

The case was submitted to the jury in a full and careful charge, in which the circuit judge used the following language:

" Now, gentlemen, in this case I think I should say to you, the mere fact, alone, that this woman's jaw was dislocated— if you find that it was dislocated during the pulling of those teeth—does not alone raise any question of negligence on behalf of this doctor, for you will recall, from the undisputed testimony of experts here produced, that it is not an unusual occurrence. But, gentlemen of the jury, I think I should say the same thing possibly, with a little modification, as to the failure of this physician to afterwards discover that this jaw was dislocated. Possibly there are some cases where that failure to discover a dislocation would be pardonable and justifiable; other cases in which it would not. I think that question is peculiarly for you, gentlemen, to determine. I think, after all, in the view this case has taken, that that is the one and only inquiry in this case. If there has been any negligence on behalf of this physician, as I have outlined my idea of negligence, it is in the failure to have discovered this condition, if he brought it about, in the first place, and that, gentlemen, will be your inquiry and upon that, gentlemen, will depend your verdict. If you find therefore, gentlemen, that this man did cause this dislocation, and that he was negligent, as I have outlined to you, in failing to discover this dislocation, and therefore a condition resulted which has been detailed to you, then he is liable, and you will pass to a consideration of the question of what amount of money will compensate this plaintiff for the damage which she has sustained."

The jury returned a verdict for the plaintiff in the sum of $300, and a judgment was entered. The defendant has brought error, and by his assignments of error he alleges that the court erred in its rulings relating to the admission of evidence, in refusing to give defendant's requests to charge, and in the charge to the jury.

The defendant assigns error upon that part of the charge above quoted, upon the ground that there was no evidence tending to show that there was any negligence in defendant's failure to discover the dislocation, and that the court should not have allowed the question to go to the jury. In this contention we cannot agree with defendant's counsel. If the jury believed the testimony of the plaintiff that defendant made an examination of her mouth on the eighth day after the teeth were extracted, we think that it was a fair question for the jury whether the defendant was not negligent in failing to discover the dislocation at that time. That question appears to have been fairly and clearly submitted to the jury in the language above quoted.

We have examined the other assignments of error. There is no merit in those relating to the admission of testimony. Those relating to the refusal to charge, as requested, present no reversible error. Those that were not properly covered by the general charge were rendered inapplicable by the restricted charge, which only submitted the question of negligence in failing to discover the dislocation at the subsequent examination which it was claimed was made by defendant. The facts relating to that branch of the case were in dispute, and were properly submitted to the jury.

We find no reversible error in the record, and the judgment of the circuit court is affirmed.

MOORE, C. J., and STEERE, McALVAY, BROOKE, BLAIR, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.